**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| SARA E. GILLIHAN, | CASE NO. 5:25-CV-00765-DAR |
| Plaintiff, | DISTRICT JUDGE DAVID A. RUIZ |
| vs. | MAGISTRATE JUDGE AMANDA M. KNAPP |
| COMMISSIONER OF SOCIAL SECURITY, | **REPORT AND RECOMMENDATION** |
| Defendant. | |

Plaintiff Sara E. Gillihan seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB").  (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

## I. Procedural History

Ms. Gillihan filed her DIB application on June 28, 2022, alleging disability beginning July 18, 2018.  (Tr. 78.)  She alleged disability due to Sjorgren's syndrome, myopathy, lupus, colectomy, chronic kidney disease, irritable bowel syndrome ("IBS"), chronic gastritis, hiatal hernia, fibromyalgia, osteoarthritis, depression, anxiety, attention deficit disorder ("ADD"), and hypokalemia.  (Tr. 72.)  Her application was denied at the initial level (Tr. 72-78) and upon reconsideration (Tr. 79-84).  She then requested a hearing.  (Tr. 100-01.)

1

On November 6, 2023, a telephonic hearing was held before an Administrative Law Judge ("ALJ").  (Tr. 35-71.)  The ALJ issued an unfavorable decision on January 31, 2024, finding Ms. Gillihan had not been under a disability from July 18, 2018, through June 30, 2020, the date last insured.  (Tr. 14-34.)  Ms. Gillihan requested review of the decision by the Appeals Council, and her request for review was denied on February 11, 2025, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)

Plaintiff filed the instant Complaint on April 16, 2025 (ECF Doc. 1), and the matter is fully briefed (ECF Docs. 9,11, 12).  She raises the following assignment of error: The ALJ's residual functional capacity ("RFC") finding is not supported by substantial evidence, and the ALJ had a responsibility to further develop the record.  (ECF Doc. 9, p. 9.)  In her reply brief, Plaintiff withdrew any argument that the psychological limitations included in the RFC are not supported by substantial evidence.  (ECF Doc. 12, pp. 1-2.)

## II.  Evidence

### A.  Personal, Educational, and Vocational Evidence

Ms. Gillihan was born in 1976 and was 42 years old on the alleged disability onset date, making her a younger individual under Social Security regulations on the alleged onset date. (Tr. 72.)  She had at least a high school education.  (Tr. 241.)  Ms. Gillihan had not worked since July 18, 2018, the alleged onset date.  (Tr. 72.)

2

**B.**     **Medical Evidence**

    **1.**     **Relevant Treatment History**[1]

On March 14, 2017, Ms. Gillihan presented to the Western Reserve Hospital emergency room ("ER") in Cuyahoga Falls with a sudden onset of upper and lower abdominal pain and rectal bleeding.  (Tr. 439.)  An abdominal CT revealed evidence of an inflammatory bowel process.  (Tr. 437-38.)  A colonoscopy confirmed this and indicated ischemic colitis.  (Tr. 439.)  A biopsy of intestinal polyps also showed ulceration consistent with ischemic colitis.  (Tr. 436.)

On August 23, 2018, Ms. Gillihan presented to her primary care physician, Daniel Barnabas Laszlo, M.D., at the Cleveland Clinic Stow-Munroe Falls Medical Outpatient Center ("Stow Falls MOC") for a three-week follow-up after surgery.  (Tr. 3719-21.)  Ms. Gillihan had reportedly spent time in the intensive care unit ("ICU") after perforation of the sigmoid colon caused peritonitis and required a colostomy.[2]  (Tr. 3719 (dup. at 4354).)  She had an open wound and a PICC line for Ivanez; she was in a lot of pain.  (*Id.*)  Dr. Laszlo prescribed oxycodone-acetaminophen.  (Tr. 3721.)  From August 7 through November 8, 2018, Ms. Gillihan received in-home healthcare.  (Tr. 5474-618.)

At a visit with Dr. Laszlo on November 2, 2018, Ms. Gillihan complained of abdominal pain and nausea related to her July 2018 surgery.  (Tr. 4350.)  A physical examination showed tenderness at the incision point and lower abdomen, but the colostomy was clean and healthy.  (Tr. 4351.)  Dr. Laszlo prescribed oxycodone-acetaminophen and recommended a consult with pain management.  (*Id.*)

---

[1] The summary of the medical evidence is not exhaustive and is generally limited to evidence cited by the parties that is from the relevant period (July 2018 to June 2020) and relevant to the legal and factual issues before the Court.

[2] Neither the parties nor the ALJ cited the hospital records for this hospital stay and surgery; both Plaintiff and the ALJ cited this doctor's note as evidence of the colostomy.  (Tr. 24 (citing Tr. 4354); ECF Doc. 9, p. 6 (citing Tr. 3719).)  Upon review of the record, the undersigned did not find direct records from this hospital stay and surgery.

On December 1, 2018, Ms. Gillihan presented to the ER with abdominal pain and nausea. (Tr. 1632.)  A physical examination was normal throughout (Tr. 1633-34), a CT revealed solid stool throughout the colon with no evidence of acute disease (Tr. 1636; *see* Tr. 5462), and blood tests were normal except for mild thrombocytosis and slightly low potassium (Tr. 1637).  Ms. Gillihan's symptoms improved with morphine, Zofran, and Pepcid, and she was discharged on Prilosec.  (*Id.*)  A colonoscopy performed on December 3, 2018 showed a 15cm rectal stump with no abnormalities.  (Tr. 1629.)

On January 9, 2019, Ms. Gillihan underwent a colostomy reversal and subtotal colectomy with ileorectal anastomosis performed by Walter J. Chlysta, M.D, at Western Reserve Hospital. (Tr. 823, 929-30.)  After surgery, she was noted to be tolerating the pain well and was discharged on January 11 with no ambulation restrictions and instructions to maintain a low fiber diet and follow-up with her doctors.  (Tr. 823.)

Ms. Gillihan returned to the ER on January 15, 2019, complaining of fever, chills, increasing abdominal pain, and nausea.  (Tr. 1127-30.)  She was admitted to the hospital (Tr. 1421) and underwent a CT and an ultrasound, which showed abdominal ascites (Tr. 1283-85).  A drain was placed in her abdomen.  (Tr. 1420.)  She was discharged on January 18, 2019.  (*Id.*)

The abdominal drain was removed on January 24, 2019, but Ms. Gillihan returned to the hospital on January 30 with worsening abdominal pain.  (Tr. 1540-41.)  Hospital notes indicate that she had an abscess drained two weeks prior.  (Tr. 1540.)  A CT of the abdomen and pelvis showed a thin, elongated fluid collection the anterior right abdomen that represented the remainder of the multifocal fluid collections found on the most recent CT scan; it was now too small to allow for more drainage.  (Tr. 1624.)  Lahari Vudayagiri, D.O., evaluated Ms. Gillihan and determined her pain was due to residual fluid secondary to the recent abscess drain.  (Tr.

1541.)  Dr. Vudayagiri recommended that Ms. Gillihan continue her treatment plan and increase her intake of fluids and vitamins.  (*Id.*)

Ms. Gillihan returned to the ER six months later, on July 31, 2019 (Tr. 1853-62), reporting three days of progressively worsening abdominal pain, nausea, and vomiting (Tr. 1853).  A physical examination showed tenderness to palpation and mild distension of the abdomen (Tr. 1860), and a CT of the abdomen and pelvis showed dilation and fetal station without obstruction and a distended gallbladder (Tr. 1862).  Ms. Gillihan was hypokalemic and dehydrated.  (*Id.*)  Surgery was not recommended, and Ms. Gillihan was instructed to maintain a low fiber diet, manage her pain, and take Colace.  (*Id.*)  She received fluids and potassium and was discharged on a regular diet with activity as tolerated.  (*Id.*)  Ms. Gillihan was discharged on August 1, 2019, but returned to the ER later that day, complaining of similar symptoms.  (Tr. 2120-22.)  A physical examination was normal, no repeat CT was performed, and blood work continued to show low potassium.  (Tr. 2122.)  Ms. Gillihan was kept overnight and improved while taking oral potassium.  (*Id.*)  She was discharged on August 2, 2019, with a three-day course of potassium and instructions to follow-up with her surgeon.  (*Id.*)

On October 3, 2019, Ms. Gillihan attended a rheumatology consultation with Inderprit Singh, M.D., at Cleveland Clinic Akron General Health and Wellness Cender to address lupus.  (Tr. 3233-37 (dup. at 4223-26).)  Her symptoms included morning stiffness and pain in her neck, shoulders, lumbar spine, ribs, hands, wrists, hips, and knees that lasted 4+ hours.  (Tr. 3233.)  She had been in the ER a few weeks prior with vasculitis.  (*Id.*)  A musculoskeletal examination was normal except for hypermobile joints, reducible boutonniere deformity, and thumb apposing arm.  (Tr. 3234-35.)  Labs showed abnormal ANA.  (Tr. 3235.)  Dr. Singh diagnosed fibromyalgia, chronic neck and low back pain, and benign hypermobility syndrome in addition to

other longstanding diagnoses.  (Tr. 3236-37.)  She did not believe Ms. Gillihan had vasculitis and stopped prednisone.  (Tr. 3236.)

Ms. Gillihan was evaluated at the ER on October 10, 2019, for abdominal pain, nausea, and an enlarging hernia.  (Tr. 2620, 2773.)  Her physical examination was normal (Tr. 2775), and her bloodwork was unremarkable (Tr. 2777), but an abdominal x-ray showed nonspecific, nonobstructive bowel gas pattern (*id.*).  Doctors found no surgical emergency, and Ms. Gillihan was discharged that same day with prescriptions for Phenerga and Tramadol.  (Tr. 2777-78.)

On November 13, 2019, Dr. Chlysta performed an open ventral hernia repair with mesh onlay.  (Tr. 2368-69.)  At follow-up appointments on November 21 and 26, 2019, Ms. Gillihan reported that her pain had improved but she continued to have mild nausea.  (Tr. 5447, 5449.)  Dr. Chlysta removed her drains from surgery without event.  (*Id.*)  He noted that she was improving overall and prescribed Zofran for nausea.  (*Id.*)

On February 6, 2020, Ms. Gillihan presented at the ER complaining of worsening abdominal pain, nausea, chills and fatigue for two days.  (Tr. 2779.)  Her physical examination noted tenderness over the abdomen and abnormal bowel sounds.  (Tr. 2781.)  Bloodwork and an abdominal CT showed no acute abnormality, and Ms. Gillihan was discharged on February 8, 2020 with instructions to follow-up with primary care and gastroenterology.  (Tr. 2784.)

On April 29, 2020, Ms. Gillihan followed up via virtual visit with Peter T. Laszlo, M.D., at Stow Falls MOC.  (Tr. 3671-72.)  She reported sharp hernia pain and bulging around the incision from her November hernia repair surgery.  (Tr. 3671.)  She also reported normal appetite, normal bowel movements, mild nausea, and constant, mild abdominal pain.  (Tr. 3672.)  On examination via video, she had mild tenderness to palpation at the right of midline incision.

6

(*Id.*) Dr. Laszlo assessed incisional hernia without obstruction, gangrene, or adverse effect of treatment and prescribed hydrocodone. (*Id.*)

On August 14, 2020, Ms. Gillihan returned to the ER with complaints of weakness, constant abdominal pain, nausea, and severe headaches. (Tr. 2786.) She reported having similar symptoms in the past with her lupus flareups. (*Id.*) Tylenol and ibuprofen cold and sinus did not help. (*Id.*) A physical examination was normal except for generalized abdominal tenderness. (Tr. 2788.) Bloodwork showed mild anemia similar to previous lab findings but was otherwise unremarkable. (Tr. 2789.) Ms. Gillihan was discharged with a prescription for Reglan and instructions to drink fluids, take over the counter medication for her headaches, and follow up with her primary care physician. (*Id.*)

**2.      Opinion Evidence**

On September 16, 2022, state agency medical consultant Mehr Siddiqui, M.D., considered medical records that included Ms. Gillihan's October 2019 rheumatology office visit and August 2020 follow-up regarding a hernia repair, but found the totality of evidence in the record insufficient to assess her physical status or functional capabilities during the alleged disability period, from July 18, 2018 through June 30, 2020, because there was only limited functional and clinical information; he therefore found no severe physical impairments. (Tr. 74.)

On January 20, 2023, state agency medical consultant Elizabeth Das, M.D., considered the evidence in the file, including additional medical records submitted on reconsideration, but noted that the new evidence was dated after the June 2020 date last insured, and affirmed Dr. Siddiqui's findings of insufficient evidence and no severe physical impairments. (Tr. 81.)

### C.      Hearing Testimony

### 1.       Plaintiff's Testimony

At the hearing on November 6, 2023, Ms. Gillihan testified in response to questions from the ALJ and her attorney.  (Tr. 44-64.)  A Vocational Expert ("VE") also testified.  (Tr. 64-70.)

The VE testified that a hypothetical individual of Plaintiff's age, education, and work experience with the functional limitations described in the ALJ's RFC determination could not perform Ms. Gillihan's prior work but could perform representative positions in the national economy that included mail clerk, cleaner, and office helper.  (Tr. 66-67.)  The VE also testified that it would preclude competitive employment if the person would either be off task 10% of the workday or absent more than one day per month.  (Tr. 69.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

To make a determination of disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations, summarized as follows:

1.      If the claimant is doing substantial gainful activity, he is not disabled.

2.      If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors to perform other work available in the national economy.  *Id.*

## IV.     Law & Analysis

### A.      Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).  Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'"  *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004))).  A decision will also not be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

10

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.      Sole Assignment of Error: The Physical RFC is Supported by Substantial Evidence and the ALJ Did Not Err by Failing to Further Develop the Record**

In her sole assignment of error, Ms. Gillihan argues that the ALJ's physical RFC is not supported by substantial evidence and that the ALJ erred by failing to develop the record.[3]  (ECF Doc. 9, pp. 9-14; ECF Doc. 12.)  More particularly, she asserts that the ALJ "failed to adequately articulate on what basis he made his RFC findings or why further record development was unnecessary" and "attempted to interpret raw medical data into specific functional limitations in the absence of any opinion evidence."  (ECF Doc. 9, p. 9.)  Although she recognizes that the applicable regulations give ALJs discretion to determine whether to order a consultative examination, she cites to a line of cases beginning with *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), for the proposition an ALJ is required to order a consultative examination in cases where there is "no medical source opinion" in evidence.  (*Id.* at pp. 10-11.)

The Commissioner argues in response that the physical RFC is supported by substantial evidence, and that *Deskin* is a non-binding district court decision that conflicts with applicable regulations and Sixth Circuit caselaw and should not be followed.  (ECF Doc. 11, pp. 9-20.)

**1.      The Physical RFC is Supported by Substantial Evidence**

A claimant's "residual functional capacity is the most [he] can still do despite [his] limitations."  20 C.F.R. § 404.1545(a)(1).  "The responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician."  *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1546(c), 416.946(c)).  An ALJ

---

[3] She withdrew any argument that the mental RFC was not supported by substantial evidence.  (ECF Doc. 12, p. 1.)

11

must assess a claimant's "residual functional capacity based on all the relevant evidence in [the] case record," 20 C.F.R. § 404.1545(a)(1), such as: medical history; medical signs and laboratory findings; the effects of treatment; reports of daily activities; lay evidence; recorded observations; medical source statements; effects of symptoms; evidence from attempts to work; need for a structured living environment; and work evaluations, *see* SSR 96-8p, *Assessing Residual Functional Capacity in Initial Claims*, 61 Fed. Reg. 34474, 34477 (July 2, 1996).

Here, the ALJ identified numerous physical impairments that he found to be "medically determinable" during the alleged disability period (Tr. 20)[4] and summarized the relevant medical records, including one visit each for muscle pain and rheumatology and a variety of treatments for abdominal and bowel conditions, including a July 2018 colostomy, several months of in-home follow-up care ending in November 2018, a normal colonoscopy in December 2018, a reversal for colostomy and subtotal colectomy in January 2019, and a hernia repair in November 2019.  (Tr. 24-25.)  The ALJ also acknowledged Ms. Gillihan's subjective complaints and argument "that she would be unable to sustain full time work due to being off task and absent and needing to use the bathroom many times per day for an extended amount of time," but found her complaints inconsistent with the medical evidence, explaining:

> [T]reatment records indicate her main issue was constipation in late 2018, and after her surgery in January 2019, she was happy that she was no longer constipated and was having 3-6 bowel movements, which is not an amount that would cause excessive time off task or breaks. Further, the frequency was expected to continue to decrease over the next year (25F/18), and there is no mention of significant problems until July 2019, at which time she complained of diarrhea; however, at follow-up in September 2019, she reported having 1-4 bowel movements a day, which was noted to be pretty good given her past subtotal colectomy and prior issues with constipation. She improved further since hernia repair in November 2019. In April 2020, she reported normal appetite, tolerating PO well, BMs normal, mild nausea and abdominal pain, and no vomiting (18F/285).

---

[4] He noted that other impairments were not "medically determinable" prior to the date last insured.  (Tr. 20.)

12

(Tr. 23.)  The ALJ then explained his physical RFC findings as follows:

> I find a restriction to light work with frequent balancing, reaching, handling, and fingering, occasional climbing ramps/stairs, stooping, kneeling, crouching and crawling, and no climbing ladders, ropes or scaffolds supported by diagnoses of Sjogren's syndrome, hypermobility syndrome, and fibromyalgia, particularly with the findings noted at the Rheumatology evaluation in October 2019 (18F/294), although there are no records of follow-up until July 2021. Nonetheless, the findings support light lifting, postural restrictions, and frequent reaching, handling and fingering. The limitations are further supported by issues with abdominal pain and limitations due to multiple gastrointestinal surgeries, which support limitations to light lifting and postural restrictions. Further, restrictions of occasional exposure to extreme cold, extreme heat, humidity, vibrations, and no exposure to hazards such as unprotected heights, dangerous moving mechanical parts and commercial driving are included to prevent exacerbations of swelling and pain and to prevent injury. A restriction of only occasional exposure to pulmonary irritants such as fumes, odors, dusts, gases and poor ventilation, is included due to diagnosis of emphysema, despite the fact that the claimant continued to smoke cigarettes.

(Tr. 23-24.)  In so finding, the ALJ acknowledged that the two state agency medical consultants had "found insufficient evidence prior to the date last insured" but concluded that their opinions had "no persuasive value" and were unsupported because the evidence was "sufficient to assess functioning during the time period at issue."  (Tr. 25.)

 In support of her argument that the RFC findings lack the support of substantial evidence, Ms. Gillihan does not identify specific medical evidence the ALJ mischaracterized or failed to address, nor does she identify inconsistencies in the medical records the ALJ failed to consider.  Instead, she simply asserts that the ALJ did not have the "expertise" to adopt an RFC without a medical opinion or unspecified "evidence describing Plaintiff's functional limitations during the relevant time period."  (ECF Doc. 9, p. 12.)  In her reply brief, she "reaffirms and reiterates her argument that the ALJ's RFC is not supported by substantial evidence in the absence of *any* opinion evidence in this case regarding her physical functioning."  (ECF Doc. 12, p. 2 (emphasis in original).)  She also argues that the ALJ erred when he "did not explain how he

was able to assess Plaintiff's physical RFC when two State agency physicians concluded that the record was insufficient for such a determination." (*Id.* at p. 3.)

As to how the ALJ could justify finding physical limitations were supported by the evidence when the state agency medical consultants did not, it is obvious that the state agency consultants did not review the same record as the ALJ.  Nearly 2,000 pages of medical records were added to the electronic file after Dr. Das affirmed Dr. Siddiqui's findings on reconsideration (Tr. 3778-5644 (Exhibits 15F-26F)), including over 1,000 pages of Cleveland Clinic records dating from 2006 through 2023 (Tr. 4029-5060 (Exhibit 18F)) and over 100 pages of home health service records from August through November 2018 (Tr. 5471-5618 (Exhibit 26F)).  The ALJ cited heavily to these later-provided exhibits in his analysis of the medical records (*see* Tr. 23-25), and Plaintiff herself cited to some of the records in her factual summary (ECF Doc. 9, p. 6 (citing Tr. 4350, 5472-5618)).  The ALJ also personally engaged with Ms. Gillihan at her hearing, listening to her testimony and her representative's arguments regarding her treatment and functional limitations (Tr. 43-64), and acknowledged both Plaintiff's subjective complaints and her representative's related arguments in his written decision (Tr. 23). Having acknowledged Plaintiff's subjective complaints and summarized medical records showing multiple surgeries, months of home health care, and treatment for rheumatological conditions, the ALJ was supported by substantial evidence and adequately articulated the basis for his findings when he concluded that state agency opinions finding "insufficient evidence" of functional limitations had no persuasive value and were unsupported because the record contained sufficient evidence to assess functioning during the time period in question (Tr. 25).

The undersigned therefore finds Plaintiff has not met her burden to show that the ALJ's physical RFC analysis or stated reasons for finding the state agency opinions unpersuasive

14

lacked the support of substantial evidence.[5]  Accordingly, Plaintiff's argument for remand must hinge entirely on her assertion that an ALJ is required to develop the evidentiary record by ordering a consultative examination whenever there is no medical opinion in evidence outlining specific limitations in physical functioning.  The undersigned therefore turns to that argument.

## 2.  The ALJ Did Not Have a Heightened Duty to Develop the Record

At the hearing level, after the denial of benefits on initial review and reconsideration, the Sixth Circuit explains that an ALJ must act "as an examiner charged with developing the facts" and ensure that every claimant receives a full and fair hearing.  *Lashley v. Sec'y of Health & Human Services*, 708 F.2d 1048, 1051 (6th Cir. 1983) (quoting *Richardson v. Perales*, 402 U.S. 389, 411 (1971)).  Nevertheless, "while the ALJ must ensure that every claimant receives 'a full and fair hearing,' the ultimate burden of proving entitlement to benefits lies with the claimant." *Moats v. Comm'r of Soc. Sec.*, 42 F.4th 558, 563 (6th Cir. 2022) (quoting *Duncan v. Sec'y of Health & Hum. Servs.*, 801 F.2d 847, 856 (6th Cir. 1986); citing 20 C.F.R. § 404.1512(a)), *cert. denied sub nom. Moats v. Kijakazi*, 143 S. Ct. 785 (2023); *see also Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008); 20 C.F.R. § 416.912(a)(1) ("[Y]ou have to prove to us that you are blind or disabled."); 20 C.F.R. § 416.945(a)(3) ("[Y]ou are responsible for providing the evidence we will use to make a finding about your residual functional capacity.").

In special circumstances, the Sixth Circuit has held that an ALJ must "exercise a heightened level of care" in developing the record.  *Lashley*, 708 F.2d at 1051-52.  Heightened care is required for unrepresented claimants who are unfamiliar with hearing procedures and incapable of presenting an effective case.  *See Wilson*, 280 F. App'x at 459 (citing *Lashley*, 708 F.2d at 1051-1052); *Trandafir v. Comm'r of Soc. Sec.*, 58 F. App'x 113, 115 (6th Cir. 2003)

---

[5] Indeed, if the record did lack substantial evidence to support the ALJ's finding that the state agency opinions were unpersuasive, any ALJ error would be harmless because such a record could not support a finding of disability.

(citing *Duncan*, 801 F.2d at 856).  In contrast, heightened care is not required for unrepresented claimants who demonstrate a grasp of the proceedings and adequately present their cases, *see Moats*, 42 F.4th at 564; *Wilson*, 280 F. App'x at 459, and certainly not for claimants who are represented by counsel at the hearing level, *see Stevenson v. Kijakazi,* No. 5:20CV2688, 2022 WL 4551590, at *13 (N.D. Ohio Sept. 29, 2022).

Ms. Gillihan has been represented by counsel since May 2022 (Tr. 85-88, 180-83) and her representatives submitted medical records in support of her application at every level of the administrative process (*see* Tr. 73, 80, 662, 810, 1121, 1522, 1851, 2088, 2216, 2610, 3184, 3496, 3959, 4004, 5139, 5329, 5442, 5471, 5619), including three medical opinions from her psychiatric providers (Tr. 5061-63, 5131-38, 5322-28).  Clearly, the ALJ did not have a heightened duty of care to develop the record in this case.[6]

### 3.       The ALJ Did Not Fail in His Duty to Develop the Record

Instead of arguing for a heightened duty of care, Ms. Gillihan argues that the ALJ's RFC necessarily lacked the support of substantial evidence because the evidentiary record lacks "*any* opinion evidence . . . regarding her physical functioning." (ECF Doc. 12, p. 2 (emphasis in original).)  She bases her argument on a line of cases that originated with a district court decision in *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, where the judge articulated the following "general rule":

> where the transcript contains only diagnostic evidence and no opinion from a medical source about functional limitations (or only an outdated nonexamining agency opinion), to fulfill the responsibility to develop a complete record, the ALJ must recontact the treating source, order a consultative examination, or have a medical expert testify at the hearing.

---

[6] Although many records were submitted by Plaintiff's counsel, the Commissioner also requested and obtained medical records from Ms. Gillihan's providers.  (*See, e.g.,* Tr. 73, 80, 3239, 3497, 3739, 3776, 4029, 5064.)

*Id.* at 912.  The Commissioner argues in response that *Deskin* is non-binding precedent, has been widely criticized by other district courts, and conflicts with both Social Security regulations and Sixth Circuit precedent.  (ECF Doc. 11, pp. 12-15.)

As an initial matter, there is no evidence that the ALJ in this case failed or refused to provide any requested assistance in developing the evidentiary record.  Before the November 2023 administrative hearing, Plaintiff's counsel advised the ALJ of five categories of outstanding records.  (Tr. 307-08.)  At the hearing, counsel told the ALJ that three categories of records remained outstanding, including pain management records since 2023, infectious disease records since 2017, and renal care records since 2017 (Tr. 41-42; *see* Tr. 307).  Counsel agreed that the administrative record was otherwise complete, and that thirty days would be sufficient to submit any outstanding records.[7]  (Tr. 41-42.)  In all of those written and oral communications with the ALJ regarding the evidentiary record, Plaintiff's counsel did not raise any concerns regarding the lack of medical opinion evidence relating to Plaintiff's physical functional limitations.  He also did not advise the ALJ that medical opinion evidence from Plaintiff's providers was outstanding, did not ask the ALJ for assistance in obtaining additional medical opinion evidence from Plaintiff's medical providers, and did not ask the ALJ to order a consultative physical examination.[8]  (*See* Tr. 41-42, 307.)  Since Ms. Gillihan was represented and bore "the ultimate burden of proving entitlement to benefits," *Moats*, 42 F.4th at 563, her representative's failure to advise the ALJ of any supposed need for another medical opinion, and additional failure to ask the ALJ to obtain or assist with obtaining such opinion evidence, strongly undermines Plaintiff's

---

[7] The pain management records were later submitted (Tr. 5619), but no other records were submitted, despite the ALJ granting counsel an additional thirty days to submit those records (Tr. 311).

[8] Conversely, Plaintiff's counsel submitted three medical opinions from Plaintiff's treating psychiatric providers. (*See* Tr. 5061-63, 5131-38, 5322-28.)

17

after-the-fact argument that the ALJ committed error when he did not independently obtain such medical opinion evidence.

Second, a review of applicable regulations reveals that ALJs have broad discretion to determine whether and when to order a consultative examination.  The regulations explain that the Commissioner "*may* decide to purchase a consultative examination," 20 C.F.R. § 404.1519a(a) (emphasis added), and outline the following potential situations where such an examination may be purchased:

> (b) Situations that may require a consultative examination. We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim. Some examples of when we might purchase a consultative examination to secure needed medical evidence, such as clinical findings, laboratory tests, a diagnosis, or prognosis, include but are not limited to:
>
> > (1) The additional evidence needed is not contained in the records of your medical sources;
> >
> > (2) The evidence that may have been available from your treating or other medical sources cannot be obtained for reasons beyond your control, such as death or noncooperation of a medical source;
> >
> > (3) Highly technical or specialized medical evidence that we need is not available from your treating or other medical sources; or
> >
> > (4) There is an indication of a change in your condition that is likely to affect your ability to work, but the current severity of your impairment is not established.

20 C.F.R. § 404.1519a(b); *see also* 20 C.F.R. § 404.1512(b)(2) (providing that the Commissioner "may order a consultative examination" when "a source is not productive, is uncooperative, or is unable to provide certain tests or procedures").

The Sixth Circuit has also confirmed that it is within an ALJ's "discretion to determine whether further evidence, such as additional testing or expert testimony, is necessary." *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001); *Landsaw v. Sec'y of Health & Hum. Servs.*, 803 F.2d

211, 214 (6th Cir. 1986) ("[T]he regulations do not require an ALJ to refer a claimant to a consultative specialist, but simply grant [her] the authority to do so if the existing medical sources do not contain sufficient evidence to make a determination."); *see also Cox v. Comm'r of Soc. Sec.*, 615 F.App'x 254, 263 (6th Cir. 2015) (finding an "ALJ's duty to develop the record" does not "require the ALJ to order a consultative examination at all") (citations omitted).

Ms. Gillihan acknowledges that the governing regulations give ALJs discretion to decide whether to order a consultative examination, but argues that "a line of cases stemming from *Deskin* . . . have interpreted the regulations to require a consultative opinion when 'an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence.'"  (ECF Doc. 9, pp. 10-11 (quoting *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *1-2 (N.D. Ohio Oct. 21, 2011)).)  Plaintiff's argument is somewhat telling, in that it acknowledges a distinction between the explicit terms of the regulations—which provide clear discretion to the Commissioner and ALJs—and the cases following the *Deskin* "rule" to apply a more stringent standard that is not specifically articulated in the regulations.

As both parties acknowledge, *Deskin* is not binding authority and some judges in this district have criticized or declined to follow the *Deskin* standard.  *See, e.g., Winans v. Comm'r of Soc. Sec.*, No. 5:22-cv-01793, 2023 WL 7622634, *4 (N.D. Ohio November 15, 2023); *Fox v. Comm'r of Soc. Sec.*, No. 5:23-CV-580, 2023 WL 7018362, at *8-9 (N.D. Ohio Oct. 10, 2023), *report and recommendation adopted*, No. 5:23 CV 580, 2023 WL 7222824 (N.D. Ohio Nov. 2, 2023); *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010); *see also Carr v. Comm'r of Soc. Sec.*, No. 5:23-CV-00187, 2024 WL 1343473, at *5 (N.D. Ohio Mar. 30, 2024) (collecting cases).

In *Winans*, for example, the court held that an "ALJ did not need to request a consultative examination to make the disability decision," despite the lack of medical opinion evidence, because the record contained "substantial evidence supporting the ALJ's finding that [the plaintiff] was not disabled." 2023 WL 7622634, at *4.  The *Winans* court described *Deskin* as "a non-binding district court decision that conflicts with the regulations and Sixth Circuit case law" and ultimately "places a higher burden on the ALJ than the Sixth Circuit does." *Id.*  In *Fox*, the court acknowledged the body of caselaw applying the "*Deskin* rule," but observed that "*Deskin* isn't controlling, and it has received mixed reviews" before concluding:

> The bottom line is that various courts apply various standards from largely unpublished district court opinions. I return to the language of the regulations and Sixth Circuit authority, which make clear that the burden to prove her case rests on the claimant, not the ALJ.

2023 WL 7018362, at *8-9 (citing *Moats*, 42 F.4th at 563 and 20 C.F.R. § 404.1512(a)).

As discussed above, the Sixth Circuit specifies that "[t]he responsibility for determining a claimant's residual functional capacity rests with the ALJ, not a physician." *Poe*, 342 F. App'x at 157.  In keeping with that responsibility, the Sixth Circuit does not require an ALJ to "get the opinion of another physician before setting the [RFC]." *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018).  Indeed, the court has "rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ." *Id.* at 401-02 (citing *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) *and Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013)).  The Sixth Circuit has also explained that an ALJ is "not required to obtain a medical expert to interpret the medical evidence related to his physical impairments." *Rudd*, 531 F. App'x at 726.  "In fact, the regulations require the ALJ to evaluate the medical evidence to determine whether a claimant is disabled." *Id.*

20

Here, Ms. Gillihan argues that the ALJ "did not have the expertise" to draw conclusions regarding her physical functional limitations without the assistance of a medical opinion. (ECF Doc. 9, pp. 11-12.) But it is the ALJ's assigned role to both evaluate the medical evidence and ultimately determine the claimant's RFC. *See Poe*, 342 F. App'x at 157; *Rudd*, 531 F. App'x at 726; *see also Winans*, 2023 WL 7622634, at *5 ("Far from prohibiting ALJs from directly evaluating medical evidence, the law requires it."). Further, Ms. Gillihan does not identify specific "raw data" that the ALJ was unqualified to interpret, nor does she identify specific clinical tests or findings that were missing from the record and necessary to the disability finding, as might otherwise justify ordering a consultative examination.

Generally, "an ALJ does not interpret 'raw medical data' where it has already been 'read and interpreted' by a medical professional." *Kleinhans v. Kijakazi*, No. 3:23-CV-00173, 2023 WL 7923901, at *8 (N.D. Ohio Sept. 28, 2023) (citing *Rudd*, 531 F. App'x at 727). In particular, diagnostic imagery like an x-ray is within an ALJ's purview to consider so long as the image has been "read and interpreted by a radiologist." *Rudd*, 531 F. App'x at 726-27. Here, the medical records considered by the ALJ documented Plaintiff's diagnoses, subjective complaints, imagery (x-rays, MRIs, and CT scans), bloodwork, examination findings, and treatment modalities. (*See* Tr. 24-25.) Plaintiff has not specifically identified records or clinical findings the ALJ was unqualified to consider, and the undersigned does not find the medical records in evidence to be beyond an ALJ's ability to interpret in assessing the RFC. *See generally Winans*, 2023 WL 7622634, at *5 ("[A]n ALJ does not improperly 'interpret raw medical data' simply by evaluating the medical evidence without the benefit of a medical opinion.") (citation omitted).

Instead of identifying specific "raw data" that the ALJ was allegedly unqualified to consider or specific testing or clinical findings that were needed from a consultative examiner to

support a disability decision, Plaintiff argues broadly that "the ALJ's RFC is not supported by substantial evidence in the absence of *any* opinion evidence in the case regarding her physical functioning."  (ECF Doc. 12, p. 2.)  This proposed finding, while potentially consistent with some cases that apply the *Deskin/Kizys* standard, goes beyond—and is not supported by—the explicit requirements and provisions of the governing regulations and Sixth Circuit precedent. Accordingly, the undersigned finds the argument lacks merit as a rule of general application.

Turning back to the duty to develop the record, it is evident that the Commissioner discharged his duty to develop the record as contemplated by the regulations.  *See* 20 C.F.R. § 404.1545(a)(3) ("[B]efore we make a determination that you are not disabled, we are responsible for developing your complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help you get medical reports from your own medical sources.").  Before the administrative hearing, the Commissioner obtained medical records and engaged state agency medical consultants to offer their opinions regarding Plaintiff's functional limitations.  (Tr. 73-74, 80-81, 3239, 3497, 3739, 3776, 4029, 5064.)  Ultimately, the state agency consultants did not find sufficient evidence in the record to support severe physical impairments and functional limitations at the time of their review.  (Tr. 74, 81.)  But the ALJ later reviewed a more complete medical record and listened to Plaintiff's testimony, after which he found the record sufficient to support severe impairments and physical limitations, but not disabling limitations.  (Tr. 22-26, 43-64.)  As discussed in Section IV.B.1., *supra*, the ALJ's reasoning was adequately articulated and supported by substantial evidence. Further, for the reasons discussed above, the ALJ was not required to exercise his discretion to engage a consultative examiner, and his failure to do so in this case did not deprive his RFC of the support of substantial evidence.

A few other observations are worth noting here.  First, when a disability application involves a remote date last insured, relevant medical records are sometimes sparce due to limited treatment and/or the passage of time.  In such situations, a state agency consultant reviewing those records may not find sufficient evidence of severe impairments and functional limitations.  Although a consultative examiner could be engaged at such times, there may also be limited value in ordering a new physical examination when the required opinion must relate to a remote time.  Here, such an examination would take place six years after the expiration of the date last insured.  Thus, a general rule requiring the retention of a consultative examiner every time state agency consultants find insufficient evidence relating to a remote time is of questionable value.

Second, as in other cases seeking to apply *Deskin*, Plaintiff's counsel here did not advise the ALJ that he was seeking medical opinions regarding Ms. Gillihan's physical functioning, and certainly did not request the ALJ's assistance in obtaining such opinion evidence.  That failure is particularly notable in a case where counsel otherwise advised the ALJ of outstanding records and supplied thousands of pages of medical records and three treating source opinions regarding mental functioning.  A general rule requiring ALJs to order consultative examinations as a matter of course in such situations poses a danger of turning Plaintiff's burden of proof on its head.

Finally, Ms. Gillihan acknowledges that the Sixth Circuit's decision in *Mokbel-Aljahami* "reaffirms the proposition that an ALJ is free to reject the relevant medical opinions of record and craft their RFC based on the record without the presence of a medical opinion that is consistent with the RFC finding" and "fits comfortably with the regulations['] clear guidance that it is the ALJ's duty to determine the RFC."  (ECF Doc. 12, pp. 1-2 (citing 732 F. App'x 395 and 20 C.F.R. § 404.1546(c)).)  Here, the ALJ rejected the opinions of the state agency medical consultants that there was "insufficient evidence" to support severe physical impairments with

23

related functional limitations.  (Tr. 25.)  If an ALJ is empowered by the regulations to reject the functional limitations set forth in the medical opinions of record and adopt an RFC based on his own assessment of the medical records, as in *Mokbel-Aljahami*, it follows logically that the ALJ is also empowered to reject medical opinions finding insufficient evidence to support functional limitations and then adopt an RFC based on his own assessment of the medical records.  The critical question is whether the RFC findings were supported by substantial evidence.

For all the reasons set forth above, the undersigned finds Ms. Gillihan has failed to show that the ALJ erred with respect to his duty to develop the record, or that he otherwise adopted a physical RFC that lacked the support of substantial evidence.  Accordingly, the undersigned concludes that Ms. Gillihan's sole assignment of error is without merit.

## V.    Recommendation

For the foregoing reasons, the undersigned recommends that the final decision of the Commissioner be **AFFIRMED**.

May 6, 2026

/s/Amanda M. Knapp

AMANDA M. KNAPP
United States Magistrate Judge

## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *See Berkshire v. Beauvais*, 928 F.3d 520, 530 (6th Cir. 2019); *see also Thomas v. Arn*, 474 U.S. 140 (1985).